UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

JOEL SCHILLING                               :
137 Patty Lane                               :        Case No.
Florence, KY 41042,                          :
                                             :        Judge _____
CHARLES SCHULKER                             :
1711 Apache Trail                            :        Magistrate Judge _____
Elsmere, KY 41017,                           :
                                             :        **CLASS ACTION COMPLAINT**
and                                          :        **WITH REQUEST FOR DAMAGES,**
                                             :        **DECLARATORY AND**
                                             :        **INJUNCTIVE RELIEF, AND WITH**
JOHN TELEK                                   :        **JURY DEMAND**
103 Edgewood Road                            :
Edgewood, KY 41017,                          :
                                             :
            Plaintiffs,                      :
                                             :
    vs.                                      :
                                             :
KENTON COUNTY, KENTUCKY                      :
303 Court Street                             :
Covington, KY  41011                         :
                                             :
and                                          :
                                             :
KENTON COUNTY FISCAL COURT                   :
303 Court Street                             :
Covington, KY  41011                         :
                                             :
and                                          :
                                             :
TERRY CARL, in his individual capacity       :
303 Court Street                             :
Covington, KY  41011                         :
                                             :
and                                          :
                                             :
DEPUTY BALDWIN, individually                 :
Kenton County Detention Center               :
303 Court Street                             :
Covington, KY  41011                         :
                                             :
and                                          :

UNKNOWN DEPUTY JAILERS 1-10, in   :
their individual capacity   :
303 Court Street   :
Covington, KY  41011   :

and

SOUTHERN HEALTH PARTNERS, INC.
811 Broad Street, Suite 500
Chattanooga, TN  37402

   Also serve:

   CT CORPORATION
   4169 Westport Road
   Louisville, KY 40207,

and

DR. RON WALDRIDGE, individually and as
an employee of Southern Health Partners, Inc.
120 E. Main Street, #2108
Lexington, KY  40507

and

NURSE SHAWNEE, individually and as an
employee of Southern Health Partners, Inc.
120 E. Main Street, #2108
Lexington, KY  40507

and

JOHN OR JANE DOES 1-10, individually
and as employees, agents, servants or
contractors of Southern Health Partners, Inc.

    Defendants.

## I.   INTRODUCTION

   1.   The factual background detailed below establishes that the Plaintiffs herein have

been denied medical attention for their serious medical needs, and appropriate and necessary

medication prescribed by recognized medical authorities, as a result of Defendants' neglect of

and deliberate indifference to the Plaintiffs and their medical needs.  The Kenton County Detention Center, at all times relevant, has in effect a list of "inmate rules and regulations," which includes the following under "inmate rights":  "all inmates are entitled to healthcare comparable to that available in the community."

2.     It is apparent -- based upon the experience of these Plaintiffs and upon information and belief the experience of similarly-situated individuals -- that Kenton County, the Kenton County Fiscal Court, Terry Carl, Southern Health Partners, and the other named Defendants herein, have a pattern and practice of neglect of and deliberate indifference to individuals incarcerated in the Kenton County Detention Center ("KCDC").  This neglect and indifference constitutes cruel and unusual punishment of Plaintiffs and similar-situated individuals, by Defendants.  There are questions of law and fact in this case that are common to all similarly-situated current and former incarcerated individuals at the KCDC.  Plaintiffs' claims are typical of those of the class, and they will fairly and adequately protect the interests of the class.

## II.   JURISDICTION AND VENUE

3.     Plaintiffs, and all others similarly-situated, seek recovery of actual and punitive damages from Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1983, for gross and unconscionable violations of the rights, privileges and immunities guaranteed plaintiffs by the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.  Accordingly, this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and § 1343.  Plaintiffs and the other members of the Class also seek declaratory and injunctive relief, as well as damages under the pendent jurisdiction of this Court, for negligence, gross negligence, and intentional infliction of emotional distress.

- 3 -

4.     Venue is proper in this Court because the acts or omissions complained of herein all occurred within Kenton County, Kentucky.

III.    CLASS ACTION ALLEGATIONS

5.     Plaintiffs bring this action as a class action pursuant to Rules 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure.  The Class consists of all individuals who, while incarcerated at the KCDC (both prior to and after an adjudication of guilt), have been denied medical attention for their serious medical needs, and appropriate and necessary medication prescribed by recognized medical authorities, as a result of Defendants' neglect and deliberate indifference.  The Class also consists of all individuals who, while incarcerated at the KCDC (both prior to and after an adjudication of guilt), have been subjected to intentional physical and mental abuse by Defendants in violation of the Eighth Amendment prohibitions on cruel and unusual punishments, and the Fourteenth Amendment's guarantee of due process and liberty.

6.     Plaintiffs will fairly and adequately protect the interests of all Class members. They are members of the Class and their claims are typical of the claims of all Class members. Plaintiffs will aggressively pursue the interests of the entirety of the Class.  Plaintiffs' interest in obtaining injunctive relief and actual and punitive damages for the violations of their Constitutional rights and privileges are consistent with, and not antagonistic to, those of any other person within the class.

7.     Given the circumstances of their incarcerations, as detailed below, Plaintiffs allege that Defendants have a policy, custom and/or practice of denying individuals incarcerated at the KCDC medical attention for their serious medical needs, and appropriate and necessary medication prescribed by recognized medical authorities, as a result of Defendants' deliberate indifference to such individuals' medical needs.

- 4 -

8.      Such conduct violates such individuals' rights under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States; 42 U.S.C. § 1983; K.R.S. 441.025; 501 KAR 3:060; and 501 KAR 3:090(20).  The only question that remains to be resolved is whether Plaintiffs and the members of the Class are entitled to declaratory and injunctive relief, and to an award of compensatory and punitive damages; and, if so, the extent of such awards.

9.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

  a.      A multiplicity of suits with consequent burden on the courts and defendants should be avoided;

  b.      It may be virtually impossible for all class members to be named as parties-plaintiffs in this action;

  c.      Upon adjudication of defendants' liability, claims of the class members can be determined by this Court.

## IV.   PARTIES

### A.   Plaintiffs

10.     Plaintiff Joel Schilling is a resident of Florence, Kentucky who suffered from an untreated enterovirus infection during each of the three weekends he served at the Kenton County Detention Center for delinquent child support payments during 2010, as detailed below.

11.     Charles Schulker is a resident of Elsmere, Kentucky who is a severe diabetic with only one kidney, and whose myriad of serious medical problems were left largely untreated during his incarceration at the Kenton County Detention Center during 2010, as detailed below.

12.     John Telek is a resident of Kenton County, Kentucky and a stage 1 diabetic (which means he has to have an insulin shot before each meal and another shot before he goes to

bed), and whose serious medical condition was largely ignored during his intermittent weekend incarceration at the Kenton County Detention Center during 2009, as detailed below.

### B.      Defendant Kenton County

13.      Defendant Kenton County, at all times mentioned herein, employed and was responsible for the establishment of policies, customs and practices governing the employment, training, supervision, and conduct of the officers, employees and subcontractors at the KCDC.

14.      Defendant Kenton County, at all times mentioned herein, had a responsibility to establish policies, procedures, and customs that ensured the rights of individuals detained at the KCDC were protected, to ensure that measures were put in place to correct any known violations of inmate rights, and to not acquiesce to violations of inmate rights that occurred at the KCDC.

15.      Defendant Kenton County, at all times mentioned herein, failed to ensure rights of individuals detained at the KCDC were protected;  failed to ensure that measures were put in place to correct any known violations of inmate rights;  and acquiesced to violations of inmate rights that occurred at the KCDC.

16.      Defendant Kenton County, at all times mentioned herein, had actual knowledge of the inmate rights violations stemming from numerous media reports, the volume of violations committed by its employees, agents, servants or subcontractors, the severity of injuries inmates endured and continue to endure at the KCDC, and the frequent reports made by its employees, agents, servants, or subcontractors concerning inmate rights violations to supervisors and appropriate bodies.

17.      Defendant Kenton County violated its ministerial responsibilities including the training of deputy jailers and intake prisoners;  overseeing careful and informed medical screening of incoming prisoners;  implementing the medical safety procedures enumerated in 501 KAR 3:090;  supervising mandatory in-person surveillance of every inmate pursuant to 501

- 6 -

KAR 3:060; supervising administration of necessary medications to inmates pursuant to 501 KAR 3:060; and providing a safe and habitable jail; all of which duties Defendant Kenton County breached, all to the pain, suffering, detriment, and damage of the Plaintiffs herein and all similarly-situated individuals.

### C.    Defendant Kenton County Fiscal Court

18.    Defendant Kenton County Fiscal Court, at all times mentioned herein, was responsible for providing and maintaining safe, secure, and clean conditions at the KCDC, and for providing a facility that complied with Ky Rev. Stat. § 441.055 and regulations enacted pursuant thereto, but which duty the Defendant Kenton County Fiscal Court breached to the detriment and damage of the Plaintiffs herein and all similarly-situated individuals.

19.    Defendant Kenton County Fiscal Court, at all times mentioned herein, had a responsibility to establish policies, procedures, and customs that ensured the rights of individuals detained at the KCDC were protected; to ensure that measures were put in place to correct any known violations of inmate rights; and to not acquiesce to violations of inmate rights that occurred at the KCDC.

20.    Defendant Kenton County Fiscal Court, at all times mentioned herein, failed to ensure the rights of individuals detained at the KCDC were protected; failed to ensure measures were put into place to correct any known violations of inmate rights; and acquiesced to violations of inmate rights that occurred at the KCDC.

21.    Defendant Kenton County Fiscal Court violated its ministerial responsibilities, including the training of deputy jailers in intake of prisoners; overseeing the careful and informed medical screening of incoming prisoners; implementing the medial safety procedures enumerated in 501 KAR 3:090; supervising mandatory in-person surveillance of every inmate pursuant to 501 KAR 3:060; supervising the administration of necessary medications to inmates

- 7 -

pursuant to 501 KAR 3:060; and providing a safe and habitable detention center, which duties Defendant Kenton County Fiscal Court breached, all to the pain, suffering, detriment and damage of the Plaintiffs herein and all individuals similarly-situated.

22.     Defendant Kenton County Fiscal Court, at all times mentioned herein, had actual knowledge of inmate rights violations stemming from numerous media reports, the volume of violations committed by its employees, agents, servants or subcontractors; the severity of injuries inmates endured and continue to endure at the KCDC; and the frequent reports made by its employees, agents, servants or subcontractors concerning inmate rights violations to supervisors and other appropriate bodies.

### D.     Defendant Terry Carl

23.     Defendant Terry Carl was, at all times mentioned herein, acting in his individual capacity, established policies either formally or by custom and practice, and was responsible for the employment, training, supervision and conduct of the officers, employees, agents and subcontractors of the KCDC.

24.     Defendant Terry Carl, at all times mentioned herein, had a responsibility to establish policies, procedures and customs that ensured that the rights of individuals detained at the KCDC were protected; to ensure that measures were put in place to correct any known violations of inmate rights; and to not acquiesce to violations of inmate rights that occurred at the KCDC.

25.     Defendant Terry Carl, at all times mentioned herein, failed to ensure the rights of individuals detained at the KCDC were protected; failed to ensure that measures were put in place to correct any known violations of inmate rights; and acquiesced to violations of inmate rights that occurred at the KCDC.

- 8 -

26. Defendant Terry Carl, at all times mentioned herein, had actual knowledge of inmate rights violations stemming from numerous media reports; the volume of violations committed by employees, agents, servants or subcontractors; the severity of injuries inmates endured and continue to endure at the KCDC; and the frequent reports made by employees, agents, servants or subcontractors concerning inmate rights violations to him personally, to supervisors, and to other appropriate bodies.

27. Defendant Terry Carl violated his ministerial responsibilities, including the training of deputy jailers in intake of prisoners; overseeing careful and informed medical screening of incoming prisoners; implementing the medical safety procedures enumerated in 501 KAR 3:090; supervising mandatory in-person surveillance of every inmate pursuant to 501 KAR 3:060; supervising the administration of necessary medications to inmates pursuant to 501 KAR 3:060; and providing a safe and habitable detention center, which duties the Defendant Terry Carl breached all to the pain, suffering, detriment and damage of the Plaintiffs herein and all individuals similarly-situated.

### E. Defendant Deputy Baldwin

28. Defendant Deputy Baldwin was at all times mentioned herein acting individually in his capacity as a deputy jailer or corrections officer at the KCDC, and as such established or implemented policies either formally or by custom and practice, and was responsible for the employment, training, supervision, and conduct of the officers and employees of the KCDC, or for the ministerial execution of said policies.

29. Deputy Baldwin's behavior toward Plaintiff John Telek, as detailed below, and in particular in his denial of Telek's repeated requests to have his blood sugar level checked and insulin administered, violated his ministerial responsibilities, breached his duty to Telek; and violated the constitutional and common law rights of Telek.

**F.      Defendants Unknown Deputy Jailers 1-10**

30.      Defendants Unknown Deputy Jailers 1-10 were involved, at all times mentioned herein, acting individually and in their capacity as deputy jailers or corrections officers of Kenton County, and as such established or implemented policies either formally or by custom and practice, and were responsible for the employment, training, supervision, and conduct of the officers, employees and subcontractors of the KCDC, or for the ministerial execution of said policies.

**G.      Defendant Southern Health Partners, Inc.**

31.      Defendant Southern Health Partners, Inc. is a Delaware corporation duly organized and authorized to conduct business in the Commonwealth of Kentucky, and whose principal office address is 811 Broad Street, Suite 500, Chattanooga, Tennessee 37402.  Its registered agent is the CT Corporation, 4169 Westport Rd., Louisville, KY 40207.

32.      Defendant Southern Health Partners, Inc. employs the medical professionals responsible for attending to the medical needs of the inmates of the KCDC, and as such established policies either formally or by custom and practice, and was responsible for the employment, training, supervision and conduct of persons entrusted with the medical care of inmates at the KCDC, and participated in the mistreatment of Plaintiffs herein as described below, and similarly-situated individuals.

33.      Defendants Southern Health Partners, Inc. at all times mentioned herein, had actual knowledge of inmate rights violations stemming from numerous media reports; the volume of violations committed by its employees, agents, servants or subcontractors;  the severity of injuries inmates endured and continue to endure at the KCDC;  and the frequent reports made by its employees, agents, servants or subcontractors concerning inmate rights violations to supervisors or other appropriate bodies.

- 10 -

**H.    Defendants Unknown John or Jane Does 1-10**

34.    Defendants Unknown John or Jane Does 1-10, were an agent, servant, employee or contractor of Southern Health Partners, Inc. and were charged with various duties to provide care for individuals incarcerated at the KCDC.

**I.    Defendant Dr. Ron Waldridge**

35.    Defendant Dr. Ron Waldridge is employed at 120 E. Main Street, #2108, Lexington, Kentucky 40507, and was an agent and an employee of Southern Health Partners, Inc. for all times relevant, and was charged with various duties to provide care for persons incarcerated at the KCDC.

36.    Dr. Waldridge denied medical care to inmates at the KCDC despite having knowledge that a medical condition existed, and cited KCDC policy and procedure as a rationale for denying medical care he knew to be medically necessary.

37.    Dr. Waldridge oversaw medical care and is believed to be the head physician at the KCDC responsible for ensuring that Plaintiffs herein and the Plaintiffs class received medical care and medications as necessary and appropriate.

38.    Dr. Waldridge had supervisory responsibility over medical staff with inferior qualifications; and had knowledge of ongoing issues with medical care, inmate rights violations, and inmates whose medical conditions worsened from deprivation of medical care.  Despite Dr. Waldridge's knowledge, he acquiesced to the ongoing issues with medical care.

**J.    Defendant Nurse Shawnee**

39.    Defendant Nurse Shawnee, was employed at 120 E. Main Street, #2108, Lexington, KY 40507, and was an agent and employee of Southern Health Partners, Inc. for all times relevant, and was charged with various duties to provide care and to ensure care was provided for individuals incarcerated at the KCDC.

- 11 -

40.     Defendant Nurse Shawnee violated her duties toward Plaintiff John Telek, as detailed below, and in particular by refusing repeatedly to test his blood sugar level when it was dangerously high and administer his prescribed insulin medication.

## V.     NATURE OF DEFENDANTS' CONDUCT

### A.     Constitutional Violations of Medical Staff Members At-Large

41.     Defendants Dr. Ron Waldridge, Nurse Shawnee, and Unknown John or Jane Does 1-10, were charged with the care, custody and control of the Plaintiffs herein and the Plaintiffs' Class, and were responsible for their medical care and treatment while in the custody of the KCDC.  Each such Defendant had a duty to properly care for and provide care in accordance with the training and skill for each of their respective positions, but which duties each of said Defendants did breach individually, severally and/or jointly, all to the detriment and damage of Plaintiffs herein and Plaintiffs' Class resulting in the Plaintiffs herein and the Plaintiffs' Class enduring pain and suffering.  Such positions with Defendant Southern Health Partners included but are not limited to medical doctors; medical team supervisors; medical technicians; registered nurses; licensed practical nurses; and other medical staff members.  These Defendants' breaches exceeded mere negligence and were made with knowledge of each Plaintiff's serious medical condition(s), knowing acquiescence, and/or implicit authorization to the deprivation of the bare essentials of medical care.  Additionally, these Defendants consciously disregarded the medical needs of the Plaintiffs herein and the Plaintiffs' Class, and consciously decided to withhold the bare essentials of medical care from the Plaintiffs herein and the Plaintiffs' Class.

### B.     Constitutional Violations of Kenton County Detention Members At-Large

42.     Defendants Kenton County, Kenton County Fiscal Court , Terry Carl, Unknown Deputy Jailers 1-10, and Deputy Baldwin, were charged with the care, custody and control of the Plaintiffs herein and the Plaintiffs' Class, and were responsible for ensuring that the KCDC

- 12 -

operated in compliance with United States laws and regulations; Kentucky laws and regulations; the United States Constitution; the Kentucky Constitution; and KCDC policy, custom and procedures while Plaintiffs herein and the Plaintiffs' Class were in the custody of the KCDC. These Defendants had a duty to ensure inmates received proper medical care and to ensure Plaintiffs herein and the Plaintiffs' Class were free from cruel and unusual punishment. These Defendants were required to discharge their duties in accordance with the training and skill for each of their respective positions, but which duties each of these Defendants did breach individually, severally and/or jointly, all to the detriment and damage of Plaintiffs herein and the Plaintiffs' Class, resulting in the Plaintiffs and the Plaintiffs' Class members enduring cruel and unusual punishment and the denial of the bare essentials of medical care. These Defendants' breaches exceeded mere negligence and were made with knowledge of the serious medical condition(s) of each Plaintiff herein and Plaintiffs' Class; and in response to customs, policies, and procedures that were the moving force behind cruel and unusual punishment. Defendants' breaches were the product of actual knowledge, knowing acquiescence, and/or implicit authorization to the deprivation of the bare essentials of medical care and cruel and unusual punishment. Additionally, the Defendants consciously disregarded Plaintiffs' medical needs, Fourteenth Amendment Rights, Eighth Amendment Rights, and Fifth Amendment Rights.

### C.     Nature of Defendants' Conduct

43.     Defendants, individually and in conspiracy with one another, engaged in the conduct described herein under color of the law of the Commonwealth of Kentucky and Kenton County. The defenses described below resulted from the failure of Defendants to employ qualified persons for positions of authority, and/or properly train and supervise the conduct of such persons after their employment, and/or properly fund ongoing KCDC operations to provide conditions and medical care that met and meet constitutional standards, and/or promulgate

appropriate operating policies and procedures either formally or by custom and practice to protect the constitutional rights of the citizens of the United States and the Commonwealth of Kentucky.  Defendants' conduct was intentional or grossly negligent, and was indicative not only of indifference to, but actual malice and a total and reckless disregard for, the constitutional and common law rights of Plaintiffs herein and the Plaintiffs' Class, justifying an award of punitive damages in addition to the actual damages Plaintiffs herein and the Plaintiffs' Class are entitled to recover.

## VI.   FACTS

### A.   As To Plaintiff Joel Schilling

44.   In 2010, Schilling was ordered to serve every other weekend at the KCDC (for a total of three weekends served) for being behind in his child support payments.  The weekend at issue was the second weekend of the three; he had already successfully served his first weekend two weeks prior to Friday, April 2, 2010.

45.   On that day, he fell and incurred an injury which required him to see his primary doctor on Saturday, April 3.  His primary doctor examined him and refilled his prescriptions.

46.   On Wednesday, April 7, Schilling was still suffering from the injury incurred the week before.  By Friday morning, April 9, Schilling's symptoms had worsened considerably.  He went in to see his primary doctor again, who diagnosed him with an enterovirus infection for which he prescribed Midrin (a pain reliever).

47.   Schilling was due to report to the KCDC that Friday evening at 6:00 p.m.  Concerned about his ability to bring his medication with him, at 5:00 p.m. that evening, he called the KCDC medical department and was told by Jane Doe # 1 that he could bring his prescription with him.

48.     Schilling was still feeling extremely ill, and out of an abundance of caution called the KCDC medical department again to reconfirm that he would have his prescription available. This time, Jane Doe # 2 told him he could not bring his Midrin medication with him. Schilling took one last Midrin and then checked himself into the KCDC at 6:00 p.m.

49.     From 6:00 p.m. to 10:00 p.m. that evening, Schilling was in a holding cell at the KCDC. He was still suffering from severe symptoms. While there, Schilling received two baloney sandwiches and an orange drink for dinner. About five minutes after finishing eating, he asked to use the restroom and vomited everything back up. Schilling informed jailers Markum, Dietz and Schwartz that he felt awful and would like to see someone from the infirmary.

50.     Approximately an hour and a half later, a nurse (Jane Doe # 3) came down to Schilling's holding cell with a cart. She checked on a couple other inmates but didn't check on Schilling.

51.     At about 9:45 p.m., Schilling was taken to get dressed and asked John Doe #1 about seeing someone from the medical department, and was told that they didn't know what was going on.

52.     At about 10:00 p.m., Schilling went back to the 5th floor and asked the guard (John Doe #2) there about seeing someone in the medical department. The guard called the medical department and told Schilling he would have to wait. Schilling waited another two to three hours, still suffering from severe symptoms. Schilling returned to the same guard (John Doe #2) who said he didn't know anything about the medical department checking on Schilling. Schilling went back to bed and spent a sleepless night until 5:30 a.m. when he was called to report to the medical department.

- 15 -

53.    Schilling was attended to by a female nurse, Jane Doe #4.  Schilling told her his severe symptoms and she took his temperature, which was 101.3°.  Jane Doe #4 gave Schilling some generic Tylenol.  Schilling asked her about his prescription for Midrin and she told him she didn't see any reason why he couldn't have it.  Schilling was sent back to the 5th floor at KCDC.  Schilling then called his mother and asked her to have his fiancé bring his Midrin down to the KCDC.

54.    Schilling's fiancé brought his Midrin prescription, a note from his doctor explaining the reason he needed it, and Schilling's Symbicort inhaler (which he also needed, but had failed to bring with him when he reported on April 9 to KCDC).

55.    Around 8:30 or 9:00 a.m., Schilling asked a guard (John Doe #3) if the guard would check to see if Schilling's medicine had arrived.  The guard checked, and reported to Schilling that the medical department had it and would bring it up the next time they did medicine rounds.

56.    By 11:30 a.m., Schilling still had not received his medication.  He was given lunch -- a hot dog, a cookie and some watered down Kool-Aid -- and ten minutes later vomited it all back up.  An inmate reported to the guard (John Doe # 3) Schilling's continued severe illness.  The guard called the medical department and related the information, and was told by Jane Doe #5 that they would send out some crackers but there wasn't anything else they could do.

57.    About two hours later, the medical department sent down some crackers to Schilling, but none of his medications.  Schilling again asked the guard (John Doe #3) about his medicine.  At approximately 5:00 p.m., Jane Doe #6 from the medical department came up and gave Schilling his Symbicort inhaler and told him he couldn't have the Midrin.

58.     Schilling was unable to keep his dinner meal down.  Another inmate reported to the guard about Schilling's condition.  The guard called the medical department, and the medical department again did not respond.

59.     Schilling spend another sleepless night, during which the medical department provided two generic Tylenol which did nothing to relieve Schilling's symptoms.

60.     Schilling did not eat any breakfast, and when the medical department nurse came around, she gave Schilling his inhaler but still no other medication.  Schilling told this nurse, Jane Doe #6 about his continuing severe symptoms, to which she responded she could not guarantee anything "and you only have eight hours left to suffer".  She took his inhaler and walked away.

61.     Schilling did not eat lunch at 11:30, for fear that he would not be able to keep it down.  When Schilling checked out of the KCDC at 6:00 p.m., he was given back his Midrin prescription, his doctor's note and his inhaler.

62.     Once Schilling was able to receive adequate healthcare outside the KCDC, he eventually recovered from his illness.

**B.     As To Plaintiff Charles Schulker**

63.     Charles Schulker was incarcerated at KCDC from February 17, 2010 through February 19, 2010.  At the time of his incarceration, he had previously suffered two heart attacks; was a severe diabetic with only one kidney; and suffered from severe depression.  He also suffered from chronic obstructive pulmonary disease ("COPD"), gout and high blood pressure.  He was (and is) under chronic pain management by Dr. Corey Gallus for an unstable knee replacement.  His pain management consists of regular use of Percocet, which he is required to take approximately four times per day.

- 17 -

64.     At the time of his incarceration his required medications included the following: Oxycodone-Acetaminophen; Diazepam; Combivent inhaler; Metformin; Lantus (subcutaneously at bedtime); Vitamin D; Omeprazole; Lisinopril; Simvastatin; Buspirone; Lovaza; Gemfibrozil; and Novolog (subcutaneously three times per day).  At the time of his incarceration, these required medications were confirmed by Lisa LNU, a registered nurse at the St. Elizabeth North facility, 401 East 20th Street, Covington, Kentucky 41014.

65.     On February 17, 2010, Schulker was arrested for alleged domestic violence. Schulker had a history of severe depression and suicidal ideation.  After being removed from his home following his arrest, he attempted to jump out of a moving police car in order to kill himself.  This led to his treatment at the St. Elizabeth North facility, during which time his various medications and the need for them was confirmed.  The emergency department chart not only confirms those medications and the need for them, but also identifies Schulker's coronary artery disease; his hypertension; and his severe recurrent depression which has required prior hospitalization.

66.     At the time of his examination at St. Elizabeth North, police officer John Doe #4 informed the examining medical professional that Schulker would be placed on suicide watch at the KCDC.  St. Elizabeth North discharged Schulker on September 17 into police custody so that he could be taken to the KCDC.

67.     Despite Schulker's serious medical problems, and significant need for substantial regular medications -- all of which were actually known to the KCDC and responsible individuals there -- during his incarceration, Schulker received none of his anti-depression medication, and received only one shot of insulin per day despite needing three such shots per

- 18 -

day.  Additionally, Schulker developed a staph infection from sitting naked on a concrete floor during his supposed suicide watch.

68.    Schulker was examined by the KCDC medical staff only one time per day, during which he repeatedly asked for his required medication but which requests were denied.

69.    Schulker was discharged from the KCDC on February 19, 2010.

**C.    As To Plaintiff John Telek**

70.    John Telek is a Stage 1 diabetic, which means he has to have his insulin shot before each meal, and another type of shot before he goes to bed.  During August 2009, Telek was required to spend weekends at the KCDC.  Telek ensured that his treating physician Francis Collins, sent to the KCDC in advance of Telek's incarceration his insulin prescriptions and instructions.

71.    Contrary to Collins' instructions, and accepted medical practice, upon Telek's arrival at the KCDC on the evening of Friday, August 4, 2009 at 7:00 p.m., Telek's sugar level was not checked until nearly 3:00 a.m. the next morning at which time he was given 40 units of Lantus and peanut butter crackers by a nurse, Jane Doe #1.

72.    At 5:00 a.m. on Saturday, August 5, 2009, Telek's sugar level was 91 and he was given 40 units of Novolog.

73.    At 10:40 a.m., Telek asked Corrections Officer Baldwin to call a nurse because Telek's sugar level was too high and he needed to check it and take insulin before lunch.  At 10:50 a.m., Baldwin called Nurse Shawnee to check Telek's sugar level or provide him with his needed insulin.  She refused, explaining that inmates only get their sugar level checked in the morning and evening.

74.    By 4:44 p.m. on August 5, Telek's sugar level was dangerously high at 302, at which time Telek was given 16 units of Novolog and 40 units of Lantus.

- 19 -

75.     At 4:50 a.m. on Sunday, August 6, 2009, Telek asked C.O. Arrowwood to make sure he could see a nurse before breakfast.  Telek did not get to see a nurse.

76.     At 6:15 a.m. that morning, Telek's sugar level was 96 and he was given 4 units of Novolog.

77.     At 10:40 a.m., Telek asked C.O. Graham to call a nurse to check his sugar level and give him an insulin shot.  Nurse Shawnee told C.O. Graham that she does not check sugar levels at lunch time or insulin shots; only at breakfast and dinner.

78.     By 4:16 p.m. on August 6, Telek's sugar level was dangerously high at 334.  He was given 40 units of Lantus and 14 units of Novolog.

79.     At 5:45 p.m., C.O. Powell took Telek out in handcuffs to see Defendant Terry Carl.  Defendant Carl told Telek that he was being sarcastic with Carl's staff.  Telek explained to Carl his serious medical condition and the difficulties he was having in receiving proper medical care and medications, pursuant to his doctor's instructions which had been previously faxed to Carl and his staff.

80.     With his weekend incarceration concluded, Telek was discharged that evening.

81.     Contrary to the instructions of Telek's physician, and accepted medical practice, upon Telek's arrival at the KCDC for his next weekend incarceration on the evening of Friday, August 21, 2009, he was told by John/Jane Doe #1 that as a Type 1 diabetic he was only allowed to check his sugar levels in the morning (at approximately 5:00 a.m.) and before dinner (at approximately 4:00 p.m.).

82.     At 11:20 a.m. on August 22, as lunch arrived, Telek informed Deputy Baldwin that he was a Type 1 diabetic and needed to check his sugar level and take the appropriate amount of insulin before he eats.  Deputy Baldwin denied Telek's request.  Baldwin called a

- 20 -

nurse in the medical department, Jane Doe #1, and Telek was told that KCDC did not check sugar levels at lunch.

83.     At approximately 12:15 p.m. Telek informed Deputy Baldwin that his sugar level was very high and if he were allowed to check it he would show that he was in dire need of an insulin shot.  His request was refused.

84.     At 1:30 p.m., Telek again asked Deputy Baldwin to call the medical department and tell them Telek needed an insulin shot.  His request was refused.

85.     At 4:45 p.m., Telek's blood sugar was 432, which is extraordinarily and dangerously high.  He was forced to take a shot of Lantus, despite telling the medical department nurse, Jane Doe #2, that he is to take Lantus at 9:30 p.m.  She said she did not care.  Telek also received a shot of Novolin R, which is not his prescribed medication.

86.     At 5:15, when Telek's dinner meal arrived, the Lantus had had no effect in bringing his sugar level down.  Accepted medical practice would be for Telek to check his sugar level before bed, but he had already been told that would not be permitted.

87.     At 5:15 a.m. on August 23, 2009, Telek's sugar level was dangerously low, at 37. He was denied his request to take insulin.  He ate breakfast and his sugar level went up.

88.     At 7:45 a.m., pursuant to Telek's request, Corrections Officer Graham called the medical department to tell them that Telek's sugar level was high and needed to be checked along with a shot of insulin.  Staff Sgt. Herpts said he would check into it.  Nothing more was done.

89.     At 9:50 a.m. Corrections Officer Graham again called the medical department to ask if they would check Telek's sugar level.  Nothing more was done.

90.     At 11:05 a.m., Corrections Officer Graham told Telek that lunch was being served, and Telek told Graham that he needed to check his sugar level and take an insulin shot. Graham called the medical department who told her that they did not come down at lunchtime. Graham called her supervisor, Defendant Terry Carl. Graham also called, and was told again that there would be no sugar level check and no insulin until 4:00 p.m.

91.     At 11:50 a.m., Graham called Staff Sgt. Herpts, at which time Telek asked to speak to the commanding officer. Telek was told that the Commanding Officer "would arrive when he arrives."

92.     By 12:05 p.m., Telek had to eat. Lunch consisted on a hamburger on bread, applesauce, mayonnaise based slaw, broccoli, cauliflower, carrots and milk. Despite requests, he was now allowed to check his sugar level before the meal or take insulin.

93.     At 4:40 p.m., Telek went to the medical department where his sugar level registered dangerously high, at 473. He was again given a Lantus and Novlin R shot, despite his request that he be allowed to take his prescribed Novolog injection pursuant to the prescription and instructions that had been faxed to the KCDC by his treating physician, Dr. Collins, prior to Telek's incarceration. His request was refused.

94.     Following his discharge at the end of the weekend, on August 28 at 12:10 p.m. Telek e-mailed Defendant Terry Carl regarding his experience. In relevant part, Telek told Carl:

> I have been sentenced to serve five weekends in jail in a domestic case, by Judge Mehling. I am a Type 1 diabetic. I served my first weekend on 8/21/09. During that weekend, the medical staff at your facility refused to allow me to properly manage my diabetes. I was refused the opportunity to test my sugar levels before each meal and was not given the proper amount or type of insulin required before each meal as prescribed by my doctor. This resulted in dangerously high sugar levels throughout the majority of the weekend that I was incarcerated at your facility. Even though they had received the Orders from my Physician, the nursing staff told me that they had the right to override my Doctor. I believe these actions are improper if not illegal.

- 22 -

> The KCDC Inmate Rights Form clearly states that I am to receive the same level of care inside your facility as I would on the outside.  This has not been the case.  The extreme levels of my blood sugar while in your facility could very well result in my going into a diabetic coma.  Something I hope does not happen.
>
> Please instruct your medical staff to follow my doctor's instruction on management of my diabetes during the remaining weekends that I have to spend in your facility.

95.     Despite Telek's e-mail to Defendant Terry Carl, at 12:10 p.m. on Friday, August 28, 2009, prior to Telek's reporting for his next weekend of incarceration at 6:00 p.m. that evening, Telek's prior experience with willfully negligent medical treatment was repeated.

96.     Telek arrived at 7:00 p.m. that evening for intake.  He saw a nurse, Jane Doe #2, who asked if Telek needed his shot at 9:30 p.m.  Telek told her that he did.  At 2:44 a.m. --  six hours late -- Telek received a shot of Lantus, rather than his prescribed medication.

97.     At 5:45 a.m. on August 29, Telek's blood sugar level for breakfast was dangerously low, at 71.  A nurse, Jane Doe #3, looked at Telek's chart.  Telek had to argue with her about taking an insulin shot.  Jane Doe #3 called her supervisor, Jane Doe #4, and was told to follow Telek's instructions (as shown on his Shirley Flowers Scale, a common tool for managing diabetes).  The Scale, which Telek showed to Jane Doe #3, clearly indicated that sugar levels should be checked before every meal and before bedtime.  Jane Doe #3 again did not give Telek his Novolog shot as indicated on the Scale.

98.     Lunch was served at 10:45 a.m.  Telek told Corrections Officer Herald that he needed to check his sugar level and take his shot.  Herald called the medical department and was told that Telek did not get his sugar level checked or an insulin shot at lunch; only at breakfast and dinner.

99.     At 1:00 p.m., Telek asked C.O. Harold to call the medical department because Telek's sugar level was dangerously high.  At 1:15, a nurse confirmed that Telek's sugar level

was in fact dangerously high, at 396. For the first time during any of his incarcerations, Telek was provided with 16 units of Novalog, by Nurse Lynn.

100. At 2:15 p.m., Nurse Tracy checked Telek's sugar level and found it to still be dangerously high at 328.

101. At 4:10 p.m., Telek's sugar level was 81 and he received four units of Novalog and 40 units of Lantus. Nurse Lynn told Telek she would before or at 7:30 p.m. That did not occur.

102. At 5:35 a.m. on Sunday, August 30, 2009, Telek's sugar level was 92 and he received four units of Novalog.

103. At 9:00 a.m., Telek's sugar level was dangerously high, at 560, which he reported to two nurses from the medical department, Jane Does #5 and 6. He asked them to return to confirm his sugar level which they said they would do. They never appeared.

104. At 10:45 a.m., Telek asked Corrections Officer Rieskamp to call the medical department so Telek could check his sugar level and take his prescribed insulin shot, Novalog.

105. At 11:00 a.m. lunch was served. At 11:30 a.m., Rieskamp told Telek that the medical department called back and said they will not check sugar levels nor will they provide insulin at lunchtime.

106. At 4:15 p.m., Telek's sugar level was dangerously high, at 327. He received nine units of Novalog.

107. With his weekend incarceration concluded, Telek was discharged that evening.

## VII.   CAUSES OF ACTION

### A.   Count One

108. The preceding paragraphs are incorporated herein by reference.

- 24 -

109.   Plaintiffs and the Class treatment at the KCDC was the result of a continuing pattern of misconduct as a consequence of the policies, procedures, customs and practices of Kenton County, either written or oral, that are systematically applied at the KCDC whenever an individual is incarcerated there, including but not limited to the persistent practice of denying inmates medical attention for their serious medical needs;  denying appropriate and necessary medication prescribed by recognized medical authorities;  and subjecting individuals held at the KCDC to cruel and unusual punishment.  Such practices constitute an arbitrary use of government power, and evince a total, intentional and unreasonable disregard for and deliberate indifference to the health, wellbeing and constitutional and common law rights of persons incarcerated at the KCDC, including Plaintiffs herein and the members of the Class identified herein;  and the wholesale violations of those rights likely to result from the systematic pursuit of such policies, customs and practices.

110.   As a result of the foregoing, Plaintiffs herein and their Class, through Defendants' deliberate indifference and intentional or grossly negligent conduct, were deprived without due process of law of their right not to be subjected to cruel and unusual punishment under the 5th, 8th and 14th Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. §1983.

111.   Moreover, given the pre-existing law that clearly prohibited Defendants' conduct, Defendants' treatment of Plaintiffs herein and the members of their Class was intentional, wanton, and malicious, and was indicative of Defendants' total and reckless disregard of and deliberate indifference to the rights of, and harm to, Plaintiffs herein and the members of their Class.

**B.   Count Two**

112.   The preceding paragraphs are incorporated herein by reference.

- 25 -

113. By virtue of the foregoing, Defendants have knowingly and intentionally violated 501 KAR 3:090(20), 501 KAR 3:060, KRS 441.055, KRS 441.025, and KRS 441.045.

### C. Count Three

114. The preceding paragraphs are incorporated herein by reference.

115. By virtue of the foregoing, Defendants were negligent and grossly negligent, and violated the standards applicable to their professions, all to the damage of the Plaintiffs herein and their Class.

## VIII. DAMAGES

116. The preceding paragraphs are incorporated herein by reference.

117. As a consequence of Defendants' wrongful conduct Plaintiffs and the members of their Class have been denied medical attention for their serious medical needs, and appropriate and necessary medications prescribed by recognized medical authorities; and have also been subjected to cruel and unusual punishment.

118. As a result of the foregoing, Plaintiffs and the members of their Class have experienced unnecessary pain and suffering, and severe and unjustified mental and emotional distress, and are entitled to recover actual damages. Furthermore, Defendants' violations of the constitutional and common law rights of the Plaintiffs and their Class were knowing, intentional, cruel, malicious, and evinced a total and reckless disregard for the rights of Plaintiffs and their Class, entitling them to recover punitive damages from the Defendants in order to deter such conduct in the future.

## IX. DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

119. The preceding paragraphs are incorporated herein by reference.

120. In addition to the foregoing, Plaintiffs and their Class request that this Court issue a declaratory judgment deeming unconstitutional any and all ordinances, regulations, policies,

procedures, customs or practices which resulted in their incarceration under conditions in which they were denied medical attention for their serious medical needs and appropriate and necessary medication prescribed by recognized medical authorities;  and further request this Court permanently order Defendants to refrain from following or enforcing such ordinances or regulations, policies, procedures, customs or usages, and to alleviate all conditions at the Kenton County Detention Center that contributed to the damages sustained by Plaintiffs herein and the Class identified herein.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the class that they represent request that (A) this action proceed as a class action under Federal Rule of Civil Procedure 23; (B) a trial by jury, and (C) further request that they and all members of the class be awarded actual and punitive damages; be granted the declaratory and injunctive relief requested herein; and be awarded all costs, attorney's fees, pre- and post-judgment interest; and all other relief to which they are entitled.

Respectfully submitted,

/S/ Eric C. Deters

Eric C. Deters
Eric C. Deters & Associates
5247 Madison Pike
Independence, KY 41051
(Telephone) (859) 363-1900
(Facsimile) (859) 363-1444
(Email) eric@ericdeters.com

Attorney for Plaintiff

- 27 -