UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 10-143-DLB-CJS

CHARLES SCHULKER                                                                           PLAINTIFF

vs.              **MEMORANDUM OPINION AND ORDER**

KENTON COUNTY, KENTUCKY, ET AL.                                              DEFENDANTS

\* \* \* \* \* \* \*

Plaintiff Charles Schulker commenced this 42 U.S.C. § 1983 action against Defendants Kenton County, Kentucky, Kenton County Fiscal Court, Terry Carl, Southern Health Partners, Inc., and Dr. Ron Waldridge for allegedly denying him medical care during his brief detainment at the Kenton County Detention Center. Plaintiff also advances several statutory claims arising under state law and a state law claim for negligence. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

This matter is before the Court on Defendants' motions for summary judgment (Docs. # 55 and 59). These motions have been fully briefed (Docs. # 62, 63, and 65) and are thus ripe for review. For the reasons set forth below, Defendants' motions are hereby granted as Plaintiff's federal claims. However, rather than enter judgment as to his state law claims, the Court declines to exercise supplemental jurisdiction and thus dismisses these claims without prejudice.

**I.     BACKGROUND**

Plaintiff Charles Schulker spent just over 24 hours at the Kenton County Detention Center from February 17, 2010 through February 19, 2010 after his arrest on domestic violence charges.  (Doc. # 55-3); (Doc. # 57, at 24).[1]  During his transport to the detention center after his arrest, Schulker attempted to jump out of the moving police vehicle.  (Doc. # 57, at 13).  As a result, he was first brought to St. Elizabeth North's emergency room for treatment, and then released into policy custody and placed on suicide watch at the detention center.  (*Id.* at 73).

At the time of his detainment, officials at the detention center knew that Plaintiff was a diabetic and suffered from a myriad of other ailments, including pain related to his knee and back, anxiety, hypertension, and asthma.  (Doc. # 55-6, at 4); (Doc. # 62-3, at 2).  Accordingly, Plaintiff brought various medications with him to the facility.  (*Id.* at 68).  However, Plaintiff claims that he does not recall receiving any medication besides two insulin shots during his detention.  (Doc. # 57, at 47-48).  Additionally, he contends that he developed a staph infection around his genitalia during his stay, but was never provided any treatment.  (*Id.* at 46-47, 79).  Each of his complaints are further addressed below.

**A.     Diabetes**

Plaintiff testified that he only received two insulin shots, which he considers insufficient because he normally was given four shots per day.  (*Id.* at 70-71).  He further testified that he routinely took "two to four pills a day" for his diabetes (Doc. # 57, at 7-8),

---

[1] According to the detention center's records, Plaintiff was booked on February 17 at 9:36 p.m. and released on February 19 at 12:55 a.m.  Plaintiff does not dispute the records, at least with respect to the fact that he was booked on February 17 and released February 19.

2

but that he does not recall receiving those pills. (*Id.* at 73). The detention center's records, though, indicate that Plaintiff was placed on a special diet for his condition, and the medical administration record reflects that Plaintiff received 1000 mg of Metformin, a diabetic medication, twice on February 18th, and once on the morning of February 19th. (Doc. # 55-6, at 10, 13); (Doc. # 56, at 34, 38, 40).

### B.     Other Ailments

Plaintiff also claims that he did not receive any treatment for his other ailments. (Doc. # 57, at 39). At the time, Plaintiff was taking Percocet for pain related to his knee and back, Valium for his "nerves," and Lisinopril for his hypertension, and was using an inhaler for his asthma. (Doc. # 57, at 58); (Doc. #55-6, at 4); (Doc. # 62-3, at 2).

Although there is nothing in the detention center's records indicating that Plaintiff was given Percocet or Valium, Dr. Ronald Waldridge, who was the medical director in charge of detainee care at the time of Plaintiff's detainment, testified that he would need to make an independent assessment of whether narcotic and anxiety medications are medically necessary before continuing them.[2] (Doc. # 56, at 8, 65-66). As the doctor explained, pain and anxiety medications are ripe for abuse, while the potential harm in delaying these medications for further verification is minimal. (*Id.* at 26-28, 55-56, 58-59).

Furthermore, unlike the Percocet or Valium, the medical administration record does reflect that Plaintiff received 40 mg of Lisinopril once on the mornings of February 18th and February 19th. (Doc. # 55-6, at 13); (Doc. # 56, at 40-41). The record further indicates that

---

[2] In his deposition, Dr. Waldridge acknowledged that he has no recollection of Plaintiff, (Doc. # 56, at 29), but was able to testify with respect to his general policies as medical director of the detention center.

3

he used his inhaler on the evening of February 18th and the morning of February 19th, and that he was offered, but declined, to use it on the morning of February 18th. (Doc. # 55-6, at 13); (Doc. # 56, at 41).

### C. Staph Infection

Finally, Plaintiff contends that he developed a staph infection around his genitalia, yet was never provided any treatment for it during his detention. According to Plaintiff, the area around his genitals was "real red," which his doctor subsequently treated with "some kind of cream" and pills after he left the detention center. (Doc. # 57, at 46-47).

As with his knee and back pain and anxiety, there is nothing in the detention center's records indicating that Plaintiff received any treatment for his purported staph infection. Moreover, Plaintiff's contention is somewhat supported by a medical record dated February 22, 2010, which confirms that he was prescribed Lotrimin cream. (Doc. # 63-1). However, that record only indicates that Plaintiff had a "rash in groin;" it does not indicate whether that rash constituted a staph infection.

In light of the foregoing, Plaintiff commenced this § 1983 action against Defendants for denying him adequate medical care during his detainment.[3] Plaintiff further claims that Defendants were negligent in the level of care provided, and have violated a variety of state regulations and statutes. Discovery having since been completed, Defendants have now moved for summary judgment. (Docs. # 55 and 59).

---

[3] Plaintiff, along with Joel Schilling and John Telek, initially filed this lawsuit as a purported class action on behalf of themselves and those similarly situated. This Court subsequently dismissed the class allegations (Doc. # 15), and then Schilling and Telek voluntarily dismissed their individual claims.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, in deciding a motion for summary judgment, courts must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As is clear from the face of Rule 56, the "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted). Once the movant has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, the nonmoving party must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

## III.   ANALYSIS

### A.   Section 1983

Plaintiff was "a pre-trial detainee, [so] the Due Process Clause of the Fourteenth Amendment is the proper starting point" for analysis with respect to his § 1983 claims. *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (citation). However, notwithstanding the technical distinction, actions for inadequate medical care by inmates

5

and detainees pursuant to the Eighth and Fourteenth Amendments, respectively, are similar claims. *Border v. Trumbull County Bd. of Com'rs*, 414 F. App'x 831, 835 (6th Cir. 2011).

Because "the due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner," *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983), the Fourteenth Amendment prohibits jail officials from "unnecessarily and wantonly inflicting pain" on a detainee by acting with "deliberate indifference" toward the detainee's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a constitutional violation, a detainee must therefore establish two things: (1) "[T]he existence of a 'sufficiently serious' medical need," *Phillips*, 534 F.3d at 539 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); and (2) A jail official "subjectively perceived facts from which to infer substantial risk to the [detainee], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

With this in mind, the Court now turns to Plaintiff's complaints, i.e, that he received inadequate medication for his diabetes, that he received no medication for his other ailments, and that he developed a staph infection around his genitalia, yet was never provided any treatment for it during his detention.

    **1.**    **Diabetes**

Plaintiff has failed to set forth evidence that Defendants were deliberately indifferent to his diabetic condition. The Sixth Circuit Court of Appeals distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537

6

F.2d 857, 860 n. 5 (6th Cir. 1976) (citations omitted). In cases where, as here, a plaintiff "has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citation omitted); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").

In this case, it is undisputed that Plaintiff was given two insulin shots during his brief detainment, and he has put forth no evidence to refute that he was placed on a special diet. At best, he could only testify that he does not remember receiving Metformin, which is insufficient to constitute specific facts showing that a genuine issue remains in light of the medical administration record. *See Plant, supra*. This course of treatment, however dissatisfactory to Plaintiff, conforms with the medical judgment of Dr. Waldridge. (Doc. # 56, at 68-71). In his testimony, Dr. Waldridge acknowledged that insulin is a necessary medication, but further testified that it "can have a lot of negative consequences if you get [a patient's] sugar too low." (*Id.* at 69-70). Consequently, he indicated that nurses at the facility administered insulin based on sugar levels-*not* on the amount demanded by a detainee:

> Q: Now, this page 1, that would be -- would that be – would he be placed on the FSBS b.i.d because of the protocol, or is that because you would have ordered that, or both?
>
> A: Both, I guess. The – basically, you know, if you call me a hundred times a day as Joe nurse and say, I've got a diabetic who just came in, he says he takes a lot of insulin every day, I'm going to say, check your sugars twice a

7

>day and see what his sugar looks like and we'll give him insulin based on that.

(*Id.* at 49-50).

Simply put, Plaintiff's complaints as to his diabetic treatment amount to nothing more than a disagreement with the course of treatment he received at the detention center, which is not actionable. *White v. Corr. Med. Services Inc.*, 94 F. App'x 262, 264 (6th Cir. 2004) ("Although [the inmate] did not receive the care he wanted, the conduct he alleged did not constitute a deliberate indifference to his medical needs.") (citation omitted); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996) ("[W]here the plaintiff has been treated for diabetes but disagrees with the efficacy of the treatment, he has, at best, alleged a claim for medical negligence.") (citation omitted). This determination would be unchanged even if Plaintiff raised a genuine issue as to whether he received Metformin, as receiving two insulin shots and a special diet instead of four shots and diabetic pills is not "so woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860 n.5 (citation omitted).

### 2. Other Ailments

#### a. Pain and Anxiety

Plaintiff has made no effort to establish that either his knee and back pain or his anxiety constituted a "sufficiently serious" medical need, instead only addressing the seriousness of his hypertension and asthma in his response brief.[4] (Doc. # 62, at 6-7). This is fatal for two interrelated reasons. First, it is the obligation of the plaintiff to provide

---

[4] Plaintiff did attach a letter from his physician, which stated that he was on several medications, and that going without them could lead to serious adverse events. (Doc. # 62-1). This letter, though, does not specifically identify which medications he is referring to.

"verifying medical evidence" when the facts do not show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004) (discussing *Napier v. Madison County, Ky.*, 238 F.3d 739 (6th Cir. 2001)). Second, with respect to summary judgment adjudications, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Unlike diabetes, a layman, without more, would not readily discern that knee and back pain or anxiety require prompt medical attention, and this Court will not comb the record in an effort to identify any "verifying medical evidence."

Even if the Court assumed that Plaintiff's knee and back pain were "sufficiently serious," he has also made no effort to show that Defendants were deliberately indifferent to those conditions. Presumably, this is because Dr. Waldridge testified that, in his usual course of practice, he would need to make an independent assessment of whether narcotic and anxiety medications are medically necessary before continuing them because they are ripe for abuse, while the potential harm in delaying them further verification is minimal. For these reasons, the Court will not consider Plaintiff's complaints as to his lack of treatment for pain and anxiety.

### b. Hypertension and Asthma

Along with his diabetic pills, the medical administration record reflects that Plaintiff received both his hypertension medication and his inhaler. When directly confronted with the record, Plaintiff responded that he only remembers receiving the insulin shots:

Q: And you don't recall receiving any other medications while you were –

9

>A: No, I do not.
>
>Q: So if our records indicate that you received your Combivent inhaler, you don't remember that?
>
>A: No, I do not.
>
>Q: What about Lisinopril – prol?
>
>A: I don't remember getting anything but an insulin shot.

(Doc. # 57, at 72-73).

As with his testimony regarding Metformin, Plaintiff's testimony that he does not recall receiving his hypertension medication or his inhaler is insufficient to constitute specific facts showing that a genuine issue remains in light of the medical administration record. *See Plant, supra*. For this reason alone, these claims cannot survive. However, even if Plaintiff raised a genuine issue as to whether he received Lisinopril and/or used his inhaler, both claims would still fail, as no reasonable juror could find deliberate indifference based upon the evidence presented.

To establish deliberate indifference, Plaintiff must show that a jail official "subjectively perceived facts from which to infer substantial risk to [him], that he did in fact draw the inference, and that he then disregarded that risk." *See Comstock, supra*. This requirement "is meant to prevent the constitutionalization of medical malpractice claims," so a plaintiff "must show more than negligence . . . ." *Comstock*, 273 F.3d at 703 (citations omitted).

That being said, Plaintiff "need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). Rather, Plaintiff need only show that the prison official recklessly disregarded the

risk of harm. *Id.* Moreover, because a prison official will not ordinarily admit to such indifference, it is permissible to infer that an official had the requisite knowledge via circumstantial evidence. *Id.*

At the outset, at no point in Plaintiff's deposition did he indicate that he specifically requested and was denied either his hypertension medication or his inhaler. During his deposition, defense counsel began his questioning by explaining to Plaintiff he needed to articulate whom he made his complaints to, and when those complaints were made:

> Q: Did you make any complaints to your guards or to anybody who was checking on you in terms of your diabetes medication, your blood pressure medications, your pain medication? Anything at all?
>
> A: Yep.
>
> Q: All right. I'm going to need as much detail as you can give me on that because that's really part of – you know, that's the heart of the lawsuit so to speak, so I want you to tell me as much as you can remember the first time that you raised those concerns or raised those complaints to anybody at the Kenton County Detention Center.

(Doc. # 57, at 26-27). In response, Plaintiff indicated that "he talked to people that was walking up and down the aisle way" and that he was "beating on the door and asking for my pain medication and my Valium." (*Id.* at 27). He further testified that he wanted his insulin shots, and that he did not recall receiving any medication during his first night. (*Id.* at 28). To this point, Plaintiff's testimony comports with the notation in medical administration record, which reflected that he was not offered his hypertension medication or his inhaler until the following morning.

Plaintiff subsequently testified that he believed he was at the detention center a full day before he received any medication, but, again, he only recalled receiving an insulin shot. (*Id.* at 29). He further testified that, at the time he was given his shot, that he "asked

11

the lady upstairs when I'd get the rest of my medication," but that he was put back in an elevator and went downstairs. (*Id.* at 33). He made the same inquiry at the same time he was given the second shot, and also told the person "who walks up and down in the jail" that he needed his medication. (*Id.* at 35-36).

Along with his vague time line of complaints, Plaintiff acknowledged that he was on suicide watch during his entire stay at the detention center and testified that he does not recall filling out a sick call slip. (*Id.* at 73, 76). Terrence Carl, who testified on behalf of Kenton County, provided further details with respect to how the detention center typically conducts suicide watches and uses sick call slips. (Doc. # 58, at 32-34, 37-39).

According to Mr. Carl, a detainee on suicide watch is placed in a cell by themselves and observed every ten minutes. (*Id.* at 33). Each observation is then recorded in a handwritten log, and placed in the detainee's file. (*Id.* at 33-34). Plaintiff's observation form indicates that he was observed every ten minutes, or least 100 times, during his stay, yet has no notation of any distress, discomfort, or apparent pain. (Doc. # 55-5).

Mr. Carl further testified that detainees are expected to fill out a sick call slip in order to be seen by a nurse, which are distributed when the medicine carts are "rolled out." (Doc. # 58, at 37-38). However, if a correctional officer sees that a detainee is bleeding, throwing up, or exhibiting some other manifestation of illness, he or she can contact the medical department. (*Id.* at 39). Again, at no point in Plaintiff's deposition did he indicate that he specifically requested and was denied either his hypertension medication or his inhaler, much less that he was in any distress, discomfort, or pain; rather, he has testified that he does not recall filling out a sick call slip.

Based upon Plaintiff's own testimony, as well as the explanatory testimony of Mr. Carl and the uncontested suicide watch log, there is simply no evidence that any prison official, be it "the lady upstairs" or the person "who walks up and down in the jail," recklessly disregarded any of the risks associated with hypertension or asthma.  There is no evidence that Plaintiff specifically verbalized a request or visibly demonstrated distress, discomfort, or apparent pain, much less even attempted to follow the facility's sick call process.[5] Viewing the evidence in the light most favorably to Plaintiff, he has, at best, only put forth evidence that he demanded his pain and anxiety medications–nothing more.  The Sixth Circuit's decisions in *Wilson v. Corbin*, No. 89-2167, 1991 WL 45352 (6th. Cir. April 3, 1991) is further instructive, at least with respect to hypertension.

In *Wilson*, an inmate did not receive his hypertension medication for roughly 24 hours, and ultimately endured high enough blood pressure to warrant emergency administration of prescribed medicine and a trip to the hospital.  *Id.* at *2.  On review, the Sixth Circuit held that the nurse's failure to give him his medication did not rise to the level of a constitutional violation, even though the inmate "specifically requested his medication and told [her[ that he had not taken any previously on that day" because the court did not believe that a "single instance in failing to respond to a request for medication constitute[d] cruel and unusual punishment . . . ."  *Id.* at *3-4  (emphasis added).

Unlike *Wilson*, there is no allegation of a specific request for hypertension medication in this case, and Plaintiff testified that his primary "injury" stemming from

---

[5] In fact, Plaintiff testified that he did not know what a sick call slip is, (Doc. # 57, at 76), and he has provided no testimony or other evidence justifying why did not understand this process, much less explain his failure to take advantage of it.

13

Defendants conduct, which presumably includes failing to provide that medication, is that he no longer trusts the police. (Doc. # 57, at 80-81). If there was no constitutional violation in *Wilson*, then there is certainly no such violation here.

### 3. Staph Infection

Finally, Plaintiff's complaint that he developed a staph infection, but was never provided any treatment, fails because he has not provided sufficient evidence of the purported infection. Again, it is Plaintiff's burden to produce specific facts showing that a genuine issue remains. *See Plant, supra*. However, in so doing, he must provide more than a mere scintilla of evidence; rather, Plaintiff must present evidence upon which a reasonable jury could find in his favor. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Here, Plaintiff has provided nothing–no medical records or testimony from any physician or other medical professional–besides his testimony that he suffered from a staph infection. This sort of testimony is a classic example of a "mere scintilla of evidence," compelling summary judgment.

Alternatively, even if Plaintiff provided such evidence, he has not shown that his condition constitutes a "sufficiently serious" medical need. As previously noted, it is the obligation of the plaintiff to provide "verifying medical evidence" when the facts do not show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention. *See Blackmore, supra*. As with knee and back pain and anxiety, a layman, without more, would not readily discern that a staph infection requires prompt medical attention.

In sum, Plaintiff's complaints–that he received inadequate medication for his diabetes, that he received no medication for his pain, anxiety, hypertension, and asthma, and that he developed a staph infection around his genitalia, yet was never provided any treatment for it during his detention–are all insufficient to state a cognizable constitutional claim. Consequently, Defendants are entitled to summary judgment on Plaintiff's § 1983 claims.[6]

### B. State Law Claims

The granting of summary judgment and consequent dismissal of Plaintiff's § 1983 claims renders this Court's jurisdiction over the remaining state law claims solely supplemental under 28 U.S.C. § 1367. In *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009), the United States Supreme Court emphasized that, once a district court has dismissed every claim over which it had independent jurisdiction, the "decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *See also Gamel v. City of Cincinnati*, 625 F.3d 949 (6th Cir. 2010) (discussing *Carlsbad Technology*).

Here, Defendants contend that this Court should grant summary judgment as to Plaintiff's medical malpractice claim because he has failed to identify any expert witnesses. *See, e.g., Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) ("It is an accepted principle that in most medical negligence cases, proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent

---

[6] Because the Court has found that Plaintiffs have failed to establish the existence of a constitutional violation, there is no need to consider other arguments set forth by Defendants, both collectively and individually, for entry of summary judgment.

to draw their own conclusions from the evidence without the aid of such expert testimony.") (citations omitted) (footnote omitted). Defendants, though, have not addressed Plaintiff's allegation that they knowingly and intentionally violated several state regulations and statutes. For these reasons, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## IV. CONCLUSION

Accordingly, for the reasons state herein, **IT IS ORDERED** as follows:

1. Defendants' motions for summary judgment (Docs. # 55 and 59) are hereby **GRANTED**.

2. Plaintiff's federal claims are hereby **DISMISSED WITH PREJUDICE**;

3. The Court declines to exercise supplemental jurisdiction; therefore, Plaintiffs' state law claims are hereby **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3);

4. This matter is hereby **STRICKEN** from the docket of the Court; and

5. A Judgment in favor of Defendants will be entered contemporaneously herewith.

This 17th day of January, 2013.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2010\10-143 MOO Granting MSJ.wpd